UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 15 |
| | : | |
| SPHINX, LTD., et al., | : | Case No. 06-11760 (RDD) |
| | : | |
| Debtors in Foreign Proceedings. | : | (Jointly Administered) |

-----------------------------------------------------------x

Appearances:

For Kenneth M. Krys and Christopher Stride, as Joint Official Liquidators:  Kaye Scholer
LLP, by Madlyn Gleich Primoff, Esq. and Benjamin Mintz, Esq., and Lovells, by Gary
Lee, Esq.

For the Official Committee of Unsecured Creditors of Refco Inc., et al.:  Milbank,
Tweed, Hadley & McCloy, by Luc A. Despins, Esq. and Andrew M. Leblanc, Esq.

For Marc S. Kirschner, as Chapter 11 Trustee for Refco Capital Markets, Ltd.:  Bingham
McCutchen LLP, by Tina L. Brozman, Esq. and Timothy B. DeSieno, Esq.

MEMORANDUM OF DECISION ON PETITION OF FOREIGN REPRESENTATIVES
FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS UNDER 11
U.S.C. §§ 1515 AND 1517(b)(1) AND REQUEST FOR RELIEF UNDER 11
U.S.C § 1521(a) THAT MAY BE GRANTED UPON RECOGNITION

ROBERT D. DRAIN, United States Bankruptcy Judge:

On July 31, 2006, Kenneth M. Krys and Christopher Stride (together, the

"JOLs"), as Joint Official Liquidators of all but one of the above-captioned debtors and

as Joint Provisional Liquidators of the remaining debtor, SPhinX Managed Futures Fund,

SPC[1] ("SMFF"; with the other debtors, the "SPhinX Funds" or the "Debtors"), in the

SPhinX Funds' voluntary winding up proceedings under the supervision of the Grand

Court of the Cayman Islands (the "Cayman Court"), filed petitions in this Court under

chapter 15 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

---

[1] The Grand Court of the Cayman Islands later appointed the JOLs as Joint Official Liquidators of SMFF.

On the same day, the JOLs obtained an order (Bernstein, C.J.) scheduling and approving the form of notice of an expedited hearing on their petition for recognition of the Cayman Islands proceedings as "foreign main proceedings" under sections 1515 and 1517(b)(1) of the Bankruptcy Code and their request for additional relief under section 1521(a) of the Bankruptcy Code that may be granted upon recognition (the "Petition").  They also sought a temporary restraining order under section 1519(a) of the Bankruptcy Code pending the hearing on their petition for recognition, but Judge Bernstein denied that request.

On August 16, 2006, the Court held an evidentiary hearing on the Petition and the joint objection thereto of the Official Committee of Unsecured Creditors of Refco Inc., et al. (the "Refco Committee") and Marc S. Kirschner (the "RCM Trustee"), as chapter 11 trustee for Refco Capital Markets, Ltd. ("RCM"), and issued a bench ruling granting the Petition in part, denying it in part and partially taking it under advisement.

More specifically, the Court held that the Cayman Islands proceedings should be recognized as foreign proceedings under sections 1515 and 1517(a) of the Bankruptcy Code but took under advisement whether they should be recognized as foreign main proceedings or, alternatively, foreign nonmain proceedings under sections 1517(b)(1) and (2), respectively.  Given the lack of specificity in the JOLs' request for additional relief under section 1521(a) of the Bankruptcy Code, with the exception of a request made at the hearing for which the JOLs had not provided adequate notice, and their related failure to show irreparable harm, the Court denied substantially all of the JOLs' request for additional relief, without prejudice.

This memorandum of decision states in greater detail the rationale for concluding that the Cayman Islands proceedings are foreign nonmain proceedings under 11 U.S.C. § 1517(b)(2), subject, however, to possible modification under 11 U.S.C. § 1517(d).

## Facts

**A.  The SPhinX Funds' Business and Contacts with the Cayman Islands.**  Each of the SPhinX Funds is either a limited liability company or a segregated portfolio company ("SPC") incorporated and registered in the Cayman Islands. Declaration of Kenneth M. Krys dated July 31, 2006 ("Krys Decl.") ¶ 6.

The SPhinX Funds are hedge funds whose business consisted of buying and selling securities and commodities in a manner that tracked, under a license from Standard & Poor's, certain S&P Hedge Fund Indexes.  Transcript of hearing on the Petition dated August 16, 2006 ("Tr.") at 34-5; Krys Decl. ¶ 7.

The SPhinX Funds were established as offshore entities apparently to attract non-U.S. and U.S. tax-exempt investors in the light of favorable Cayman Islands tax benefits and regulations.  August 2002 PlusFunds Due Diligence Review ("PlusFunds Review") 5, attached as Exhibit E to the Declaration of Christopher Stride dated August 15, 2006 ("Stride Decl."); Declaration of Cherry Jane Bridges dated August 14, 2006 ("Bridges Decl.") ¶ 19.  Although regulated in the Cayman Islands (with the SPCs subject to more regulation than the other SPhinX Funds), the SPhinX Funds did not conduct a trade or business in the Cayman Islands.  Tr. at 34.[2]  They had no employees

---

[2] The SPhinX Funds were prohibited, as "exempted companies" from engaging in business in the Cayman Islands except in furtherance of their business carried on outside of the Cayman Islands.  Companies Law (2004 Revision) of the Cayman Islands ("Companies Law") § 193; see also Bridges Decl. ¶ 20.

and no physical offices in the Cayman Islands (or elsewhere, for that matter).  Transcript

of Deposition of Robert Aaron 32:11-32:15, February 23, 2006 ("Aaron Dep.");

Transcript of Deposition of Patrina Farquarson 29:22-29:23, 33:16-33:18, February 16,

2006 ("Farquarson Dep.").[3]

Indeed, except for corporate books and records (minute books and other

statutory documents, not records of operations) required to be maintained under Cayman

Islands law, the Debtors apparently have no assets in the Cayman Islands.  Tr. at 32-3.

At least the JOLs have not alleged the existence of any Cayman Islands assets, and they

have acknowledged instead that "substantially all" of the Debtors' assets are in the

United States.  Krys Decl. ¶ 10.  At the hearing, Mr. Stride clarified that at least ninety

percent of the SPhinX Funds' approximately $500 million of assets are located in

accounts in the United States.  Tr. at 45.

From the SPhinX Funds' inception, their hedge fund business was actually

conducted under a fully discretionary investment management contract by PlusFunds

Group Inc. ("PlusFunds"), a Delaware corporation located in New York City, Tr. at 34-

35, which also was responsible for creating the SPhinX Funds.  Aaron Dep. 56:20-57:3,

224:8-224:12; Farquarson Dep. 233:19-234:1, 53:6-53:8).  See also PlusFunds Review;

Offering Memorandum for shares of SPhinX Ltd., dated July 1, 2003, a copy of which is

attached as Exhibit B to the Stride Decl. ("Offering Memorandum"), at 2, 16 (stating that

PlusFunds "sponsors, and acts as investment manager to," each of the SPhinX Funds).

PlusFunds is a debtor in this Court, Chapter 11 Case No. 06-10402 (JMP).  Like the

SPhinX Funds, PlusFunds is in a liquidation posture, in the process of winding up, among

---

[3] Mr. Aaron and Ms. Farquarson were directors of the SPhinX Funds at the time of their depositions.

other things, its investment management contract with the SPhinX Funds, which was

expected to be completed by August 31, 2006.  Stride Decl. ¶ 33.  Most, if not all, of the

account managers retained by PlusFunds to provide services for the SPhinX Funds did so

from the United States.  Tr. at 35, 44.[4]  Mr. Stride acknowledged that he did not know of

any trading in securities or commodities in the Cayman Islands that was engaged in by or

on behalf of the SPhinX Funds.  Id. at 34.

        As noted above, the SPhinX Funds' investment strategy was closely tied

to a license with Standard & Poor's, a division of McGraw-Hill Companies, Inc., a U.S.

company, which permitted the account managers to track certain S&P Hedge Fund

Indexes.  Id. at 35.  Corporate administration of the SPhinX Funds, including net asset

value calculation, also was conducted primarily in the United States, out of the Somerset,

New Jersey office of Derivatives Portfolio Management, Ltd. ("DPM"), id. at 29-30,

although investor subscriptions were received in the Cayman Islands for review by DPM

personnel, apparently for purposes of compliance with Cayman Islands anti-money

laundering requirements.  Id.  The SPhinX Funds' auditors were

PriceWaterhouseCoopers, an international accounting firm, with a Cayman Islands

---

[4] Mr. Stride's estimate that at least ninety percent of the SPhinX Funds' assets are located in the United States was based on his identification of the non-U.S. investment managers retained by PlusFunds and his understanding that they were responsible for managing approximately $40 million of the SPhinX Funds' approximately $500 million of assets.  Tr. at 21, 44.  He did not determine whether any of the assets managed by those advisors actually are located outside of the United States, simply assuming that they were located abroad.  Id.  The JOLs' counsel stated, however, that it was more efficient for the Debtors to maintain their accounts in the U.S., although they were free, under Cayman Islands law, to remove them from the United States, and the SPhinX Funds' asset custodian was identified as Deutsche Bank Trust Company Americas, which is located in New York City (Offering Memorandum at 14), which suggests that even more of the Debtors' assets are located in the United States than the at least ninety percent acknowledged by the JOLs to be located here.

The JOLs also identified two lawsuits pending in the United States District Court for the Southern District of New York, apparently the SPhinX Funds' only pending litigation claims; in addition, the SPhinX Funds filed proofs of claim in the PlusFunds and Refco chapter 11 cases pending in this Court.  Stride Decl. ¶ 31.

address listed in the Offering Memorandum, Stride Decl. ¶ 19, which apparently was a

requirement of Cayman Islands law.  Tr. at 37.  It is not clear how much work the

auditors actually performed in the Cayman Islands; PriceWaterhouseCoopers resigned

effective July 31, 2006.  Stride Decl. ¶ 19.

None of the Debtors' directors resided in the Cayman Islands, and Mr.

Stride was not aware of any board meeting that took place there.  Tr. at 31-32.  The

Debtors' boards consisted of Irish,[5] Bahamian and U.S. residents.

The investors in the SPhinX Funds are located throughout the world; by

dollar amount only approximately fourteen percent are located in the U.S.  Stride Decl. ¶

25.  The JOLs do not state the percentage of the SPhinX Funds' Cayman Islands

investors.  Four of the nine members of the Debtors' Liquidation Committee, elected

under the Companies Law, are U.S. based; one is Cayman Islands based.  Stride Decl. ¶

26.

With the exception of RCM, whose preference claim, discussed below,

would apparently make it the SPhinX Funds' largest creditor (assuming that the prior

settlement of that claim were unwound), there appear to be few other material creditors.

It is far from clear whether, under U.S. law, the investors in the SPhinX Funds would be

viewed, in such capacity, as creditors, and whether claims that they might assert arising

from the purchase or sale of their interests in the Debtors would be treated on the same

priority as creditors' claims.  See 11 U.S.C. § 510(b).  Counsel for the JOLs stated at the

hearing on the Petition, however, that the investors in the SPhinX Funds could qualify as

creditors for purposes of the Cayman Islands winding up proceedings.  The Refco

---

[5] Until recently, the stock of two of the Debtors was traded on the Irish stock exchange.

Committee and the RCM Trustee's joint objection to the Petition asserted that the

SPhinX Funds may be solvent; the JOLs disagree, but, as addressed below, the Court

determined that it was unnecessary to address the issue at this time.

### B. Background of the Cayman Islands Proceedings and the Petition.

RCM and affiliates that did business under the name "Refco" filed chapter 11 petitions in

this Court on October17, 2005.  RCM is a Bermuda company that provided its

client/account holders, generally institutional investors, banks, hedge funds and wealthy

individuals, with foreign exchange and securities trading and execution services.  RCM

also is in liquidation, the RCM Trustee having been appointed on April 13, 2006.  Before

that appointment, the Refco Committee, on behalf of RCM's estate, commenced an

adversary proceeding against certain of the SPhinX Funds, alleging that on the eve of

RCM's chapter 11 filing PlusFunds obtained an approximately $312 million preference

from RCM on the SPhinX Funds' behalf.  The Refco Committee also sought an

attachment of SPhinX Funds assets under New York CPLR § 6201, which the Court

granted and on a modified basis maintained over several weeks pending the expedited

trial of the preference proceeding.  On the first day of trial, the parties announced a

settlement in open court, which was subsequently memorialized in a stipulation and

proposed order executed by the SPhinX Funds (the "RCM Settlement"), and the

settlement funds were paid into escrow.

Under sections 102(1) and 363(b) of the Bankruptcy Code and Bankruptcy

Rule 9019, RCM's entry into the RCM Settlement was subject to the requirement of

notice to parties in interest in RCM's chapter 11 case and the opportunity for a hearing.

The Refco Committee filed such a motion, and certain investors in the SPhinX Funds objected to it on the basis that the RCM Settlement was <u>too</u> <u>favorable</u> to RCM.

Perhaps not trusting entirely in the merits of this objection,[6] not long before the hearing on RCM's motion a subset of those investors caused involuntary winding up proceedings under the Companies Law to be commenced in the Cayman Islands against two of the SPhinX Funds -- SMFF and SPhinX Strategy Fund Ltd.  Then, on the morning of the hearing on the merits of RCM's entry into the settlement, the Joint Provisional Liquidators who had been proposed by the investors and appointed in the Cayman Islands proceedings (the "JPLs") notified the Court of the existence of the foreign proceedings, as well as the fact that they had commenced chapter 15 cases in this Court, and sought an adjournment of the hearing to permit them to evaluate the RCM Settlement.

This Court denied the request, however, on the basis that the hearing was not for the purpose of considering the RCM Settlement from the perspective of the SPhinX Funds but, rather, from the perspective of RCM's estate and creditors, and that the Court lacked jurisdiction to weigh the merits of the settlement from the perspective of, and potentially unwind or preclude the performance by, non-debtor parties such as the SPhinX Funds.  <u>See</u> Transcript of June 8, 2006 hearing ("RCM Settlement Hearing Tr.") at 31-35; <u>see</u> <u>also</u> <u>In re Adelphia Commc'ns. Corp.</u>, 327 B.R. 143, 174 (Bankr. S.D.N.Y. 2005) ("The stated objection by the class action plaintiffs urges not that the settlement is too expensive for [the debtor], but rather that it is too favorable.  An objection of that character does not address the needs and concerns of the [debtor's] estate, nor does it

---

[6] The Court had previously limited extensive discovery sought by SPhinX Fund investor-objectors, to the extent that such discovery concerned the merits of the RCM Settlement from the viewpoint of the SPhinX Funds as opposed to RCM's estate and creditors.

involve any legally cognizable rights over which I have jurisdiction."), aff'd 337 B.R.

475 (S.D.N.Y. 2006).  (Of course the JPLs were free to take appropriate action in the

proper forum if they believed that either of the two SPhinX Funds' entry into the RCM

Settlement had been avoidable or gave rise to any causes of action against third parties,

such as those in control of SMFF or SPhinX Strategy Fund Ltd.  RCM Settlement

Hearing Tr. at  32, 34.)  The Court then approved RCM's entry into the RCM Settlement

as being in the best interests of RCM's estate and creditors and fair and equitable from

the perspective of those holding claims against and interests in RCM.

The Cayman Islands winding up petition against SPhinX Strategy Fund

Ltd. was then dismissed and the winding up petition against SMFF was "adjourned

generally."  Stride Decl. ¶ 8.  Also, the JPLs withdrew their chapter 15 petitions, no

activity having taken place in those cases after the Court's approval of the RCM

Settlement.

Certain of the SPhinX Fund investors appealed the Court's June 9, 2006

order approving RCM's entry into and performance of the RCM Settlement.  It is

important to recognize that the pendency of such appeals, regardless of their merits,

effectively postpones the date that the RCM Settlement becomes effective,

notwithstanding the SPhinX Funds' prior payment of the settlement proceeds into

escrow.  This is because the RCM Settlement provides that "[i]f this Stipulation and

Order, or any portion thereof, is not approved by the Bankruptcy Court or if it is

overturned or modified on appeal, this Stipulation and Order shall be of no further force

and effect. . . ."  RCM Settlement ¶ 6.  As a result, delay of the appeals effectively

constitutes success on appeal without consideration of the merits.  Moreover, the RCM

Trustee and the Refco Committee have persuasively asserted that delay of the effectiveness of the RCM Settlement materially adversely affects their ability to reach a global resolution of the Refco chapter 11 cases, thus conferring significant strategic leverage on the party causing delay.

Certain investors apparently having obtained control of the SPhinX Funds, on June 30, 2006 the SPhinX Funds were put into voluntary liquidation, and the shareholders appointed Messrs. Krys and Stride as joint voluntary liquidators. Stride Decl. ¶ 6. On July 4, 2006, the SPhinX Funds, with the exception of SMFF, filed voluntary winding up petitions in the present Cayman Islands proceedings. Id. ¶ 7. Although the Cayman Court did not enter winding up orders officially appointing the JOLs until July 28, 2006 (and on August 8 with respect to SMFF), Messrs. Krys and Stride appeared through counsel in their capacity as joint voluntary liquidators at a July 18, 2006 scheduling conference before the District Court on the RCM Settlement appeals and agreed to file the SPhinX Funds' appellee brief by August 23, 2006.[7] See Letter from counsel for the Refco Committee and the RCM Trustee to Hon. Richard M. Berman (August 4, 2006), and endorsed by District Judge Berman on August 9, 2006 ("August 9 Mem. Endorsement"). Judge Berman, at the SPhinX investor-appellants' request, extended the briefing schedule, with the result that appellees' briefs would be due on September 11, 2006; however, he also required Messrs. Krys and Stride to inform him no later than July 24, 2006, which was later extended to August 2, 2006, whether they would file their brief jointly with the Refco Committee and the other appellees or seek permission to file a separate brief. Id.

---

[7] None of the SPhinX Funds is a party to the appellate litigation, with the exception that certain of the SPhinX Funds are appellees in connection with a related appeal by the SPhinX investors of the Court's partial grant of SMFF's motion to quash discovery under Fed. R. Civ. P. 45(c)(3).

Nevertheless, on July 31, 2006, the JOLs also sought from this Court a temporary restraining order under section 1519(a) of the Bankruptcy Code that would enjoin further activity in the appeals.[8]  They made essentially the same argument that the JPLs had made at the RCM Settlement hearing, asserting that they needed to investigate whether the RCM Settlement was improper from the SPhinX Funds' perspective, see Transcript of hearing on Application for Temporary Restraining Order dated July 31, 2006 ("TRO Tr.") at 7-10, 27-31, with the same result.  Chief Bankruptcy Judge Bernstein denied the motion, stating as follows:

> The only issue that has really been raised[9] . . . is this appeal . . . which is subject to Judge Berman's scheduling order, and the proceeds of that settlement and, as I understand it, nothing is going to happen before August 16th[10] with respect to that anyway.
>
> It's not so clear to me that these debtors have anything to do with this appeal at this point or that the automatic stay which would be triggered by an order of [main proceeding] recognition would affect that appeal.  As I understand it the [SPhinX Funds] were parties to and proponents of the settlement.  The appeal was being prosecuted or is being prosecuted by certain investors and the [SPhinX Funds] never themselves appealed from the order, nor could they, I suppose. . . .
>
> But really it sounds to me like this is an end run around Judge Drain's order of settlement and also Judge Berman's scheduling order.  With respect to the former, it sounds to me like your problem is with the settlement and the allegation that whoever entered into the settlement or authorized the settlement on behalf of SphinX breached their fiduciary duties.  And that's an entirely separate question, I think, as to whether the

---

[8] Section 1519 of the Code provides that the bankruptcy court may grant provisional relief, under the standards, procedures and limitations applicable to an injunction, where relief is urgently needed to protect the assets of the debtor or the interests of creditors, pending determination of a foreign representative's petition for recognition of the foreign proceeding under section 1515 of the Bankruptcy Code.  11 U.S.C. §§ 1519(a), (e).

[9] The JOLs had also sought a temporary restraining order either compelling the turnover to them of the SPhinX Funds' accounts in the United States or prohibiting any action against those accounts; however, Judge Bernstein found that the JOLs had not shown any possible danger to those funds, such as a creditor's attempt to seize assets, and therefore that they had not met their burden of showing irreparable harm.  TRO Tr. at 33.

[10] The date of the hearing on the Petition.

settlement is fair and reasonable to [RCM's] estate. Everything you've
told me convinces me it is fair and reasonable and I disagree with you that
the bankruptcy court is supposed to determine the capacity of the non-
debtor party that entered into the settlement or whether it's fair and
reasonable from the non-debtor's point of view. That's precisely what it's
not supposed to determine, I think. . . .

If you have a problem with a scheduling order, that should really be
referred to the district court judge that entered the order and say exactly
what you said to me, that you've just been appointed on Friday, you have
to take a position, there are questions about whether or not you even, at
this point can take a position. It sounds to me like you oppose the
settlement, so you don't have to convince me that you can't take a position
that you oppose the settlement and support the appeal at this point, but I'll
leave that up to you. But for the reasons I've stated, I will deny the TRO.

TRO Tr. at 34-35.

The JOLs later requested District Judge Berman to stay the pending

appeals, but he directed in the August 9 Mem. Endorsement that there would be "no

suspension of the briefing schedule at this time."

## Discussion

**A.  Jurisdiction and Venue.**  This Court has jurisdiction over the Petition

under 28 U.S.C. §§ 157(a) and 1334(b).  This is a core proceeding under 28 U.S.C. § 157

(b)(2)(P).  Venue is proper in this district under 28 U.S.C. § 1410.

**B.  Recognition of the Foreign Proceedings.**

**1.  Guiding Principles.**  Congress enacted chapter 15 of the Bankruptcy

Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,

Pub. L. No. 109-8, 119 Stat. 23.  Unique to the Bankruptcy Code, it contains a statement

of purpose: "[t]he purpose of this chapter is to incorporate the Model Law on Cross-

12

Border Insolvency[11] so as to provide effective mechanisms for dealing with cases of

cross-border insolvency," with the express objectives of cooperation between United

States courts, trustees, examiners, debtors and debtors in possession and the courts and

other competent authorities of foreign countries; greater legal certainty for trade and

investment; fair and efficient administration of cross-border insolvencies that protects the

interests of all creditors and other interested entities, including the debtor; the protection

and maximization of the debtor's assets; and the facilitation of the rescue of financially

troubled businesses.  11 U.S.C. § 1501(a)(1)-(5).

Although chapter 15 replaced section 304 of the Bankruptcy Code, which

previously governed cases ancillary to foreign proceedings, chapter 15 maintains – and in

some respects enhances – the "maximum flexibility," <u>In re Brierley</u>, 145 B.R. 151, 160

(Bankr. S.D.N.Y. 1992); <u>In re Culmer</u>, 25 B.R. 621, 628 (Bankr. S.D.N.Y. 1982), that

section 304 provided bankruptcy courts in handling ancillary cases in light of principles

of international comity and respect for the laws and judgments of other nations.

This flexibility is evident not only in the policy statement in section

1501(a) but also in Bankruptcy Code section 1522, which provides that the Court may

grant or modify interim relief under section 1519 or additional relief under section 1521,

"only if the interests of creditors and other interested entities, including the debtor, are

sufficiently protected."  11 U.S.C. § 1522(a).  Two aspects of section 1522(a) are notable.

First, Congress directed the court to focus on the interests of <u>all</u> creditors and other

---

[11] This is a reference to the Model Law promulgated by the United Nations Commission on International Trade Law at its Thirtieth Session on May 12-30, 1997, UN Sales No. E.99V.3 (the "Model Law").  H.R. Rep. 109-31, pt. 1, 109th Cong., 1st Sess. at 105-107 (2005).

interested parties, not just those of U.S. parties.[12]  Second, section 1522(a) implements

and harmonizes with section 1501(a)'s policy statement:  in light of section 1501(a), the

Court shall protect the parties' interests by implementing fair, efficient and, it is hoped,

cooperative procedures designed to maximize the value of the debtor's assets for

distribution.

Flexibility also is inherent in the various forms of relief that the court may

grant, upon a proper showing, to a foreign representative.  See, e.g., 11 U.S.C. §§ 1519

(providing for interim relief that may be granted upon filing of a petition for recognition

of foreign proceeding), 1521 (providing for relief that may be granted upon recognition

of the foreign proceeding, whether as a main or nonmain proceeding), and 1507

(providing for "additional assistance" upon recognition, whether "main" or "nonmain,"

essentially tracking former Code section 304), each of which enables the court to fashion

and condition relief, such as a stay of execution against assets, entrusting to the foreign

representative, or another person authorized by the court, the administration or realization

of all or a part of the debtor's assets located in the United States, and providing for the

examination of witnesses and the delivery of information, as appropriate.

Chapter 15 also provides flexibility by acknowledging the possibility of a

concurrent plenary case under other chapters of the Bankruptcy Code while a foreign

proceeding is pending, permitting a foreign representative in a recognized foreign

proceeding to commence (11 U.S.C. § 1511) or participate in (11 U.S.C. §§ 1512, 1523)

---

[12] Other provisions of chapter 15 do require the court to consider, among other factors, the interests of U.S. creditors in certain circumstances.  See 11 U.S.C. §§ 1507(b)(2) (protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the foreign proceeding); 1521(b) (providing that court must be satisfied that the interests of creditors in the United States are sufficiently protected before entrusting the distribution of all or part of the debtor's assets located in the United States to the foreign representative).

such a case, and providing for cooperation and direct communication between the bankruptcy court and foreign courts or foreign representatives and bankruptcy trustees and foreign courts or foreign representatives.  11 U.S.C. §§ 1525-1530.  The Bankruptcy Code also permits a case to be filed by or against a foreign debtor without a concurrent case having been filed abroad, if the debtor satisfies the Code's jurisdictional requirements.  See In re Aerovias Nacionales de Colombia S.A., 303 B.R. 1, 9, 15 (Bankr. S.D.N.Y. 2003); In re Global Ocean Carriers Ltd., 251 B.R. 31, 37 (Bankr. D. Del. 2000).

Finally, chapter 15 demonstrates its flexibility in provisions that permit the court to condition relief (11 U.S.C. § 1522(b)) or modify previously granted relief in light of changed circumstances. [13]  See 11 U.S.C. §§ 1522(c) (court may modify relief previously granted under sections 1519 or 1521); 1517(d) (court may modify or terminate recognition itself, with due regard, however, to possible prejudice to parties who relied on a prior order granting recognition).

The key to harmonizing this pervasive flexibility with section 1501(a)(2)'s objective of "greater legal certainty for trade and investment" must be, again, the directive of sections 1501(a)(3)-(5) and 1522(a) to protect the interests of the parties in interest pursuant to fair and efficient procedures that maximize value.  It would be hard for any court, U.S. or foreign, to quarrel with that goal, and, of course, the remaining objective of section 1501(a)(1) -- facilitating cooperation among courts -- requires such shared fundamental expectations.

---

[13]  Bankruptcy Code section 1518 requires a foreign representative to file with a court prompt notice of any substantial change in the status of the foreign proceeding or of the foreign representative's appointment and concerning any other foreign proceeding that becomes known to the foreign representative.  11 U.S.C. § 1518.

Therefore, in cases where the court is asked under chapter 15 to reconcile conflicting claims to primacy between or among proceedings, including the matter presently before the Court, the interests of the debtor's estate, creditors and other parties, absent evidence that they support a "primary" proceeding for an improper purpose, should generally be a significant and perhaps deciding factor.  See generally In re Aerovias Nacionales de Colombia S.A., 303 B.R. 1 (Bankr. S.D.N.Y. 2003), which, although pre-dating chapter 15's enactment, is instructive in light of the flexibility that pervades chapter 15 and the chapter's stated purposes.  In Aerovias, the court decided not to dismiss the chapter 11 case of a foreign airline where, as here, no other insolvency case had been filed in a different jurisdiction.  Id. at 18.  The court did so notwithstanding that the debtor's registered office and principal place of business were outside the United States.  Id. at 4.  Having examined numerous decisions in which bankruptcy courts had either dismissed chapter 11 cases in deference to foreign proceedings or, to the contrary, maintained chapter 11 cases involving foreign debtors, the Aerovias court concluded that "the most obvious principle at work was a thorough pragmatism as to what relief would best suit the needs of the foreign debtor" and protect creditors.  Id. at 15.  Because the debtor and the great bulk of the debtor's creditors would be well served by and protected in a chapter 11 case, id. at 10, a view that was, importantly, evidenced by general creditor consensus, id. at 13, the Aerovias court held that the case was appropriately lodged under chapter 11.  Id. at 14-15. [14]

---

[14]  Among factors pragmatically considered by the court were that (a) key assets and contract parties were subject only to U.S. jurisdiction, and a U.S. proceeding would likely have been necessary under any circumstances, (b) the foreign jurisdiction's reorganization statute had certain features that under the circumstances would have made a reorganization extremely difficult, and (c) the foreign creditors had generally accepted the U.S. court's jurisdiction.  Id. at 10-14.

This is not to say, of course, that chapter 15 will eliminate all conflicts between the domestic court and foreign jurisdictions.  As noted in Underwood v. Hilliard (In re Rimsat, Ltd.), 98 F.3d 956, 963 (7th Cir. 1996), "Comity is a doctrine of adjustment, not a mandate for inaction.  In the case of parallel inconsistent proceedings in domestic and foreign courts, one must yield; there is no [blanket] presumption that it is the domestic. . . ."  See also GMAM Investment Funds Trust I v. Globo Communicacoes E Participacoes S.A. (In re Globo Communicacoes E Participacoes S.A., 317 B.R. 235, 253-54 (S.D.N.Y. 2004).  Chapter 15 does, however, provide the court with flexibility and a directive to minimize such conflicts if possible in the interests of the debtor and its creditors.  Significantly for purposes of the present matter before the Court, chapter 15 does so in part by minimizing the practical differences between the recognition of a foreign proceeding as "main" or "nonmain" under sections 1517(b)(1) or (2), enabling the court to focus only on conflicts over primacy that truly cannot be avoided.

**2.  Recognition.**  The first step to obtaining relief under chapter 15 (with the exception of interim relief under section 1519) is receiving "recognition" of the foreign proceeding under sections 1515 and 1517(a) of the Bankruptcy Code.  Chapter 15 pertains to a case ancillary to a foreign proceeding that is "recognized" by the Court, whether the foreign proceeding is a "foreign main proceeding" or a "foreign nonmain proceeding."  See 11 U.S.C. §§ 1504 ("Commencement of ancillary case.  A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515"); 1502(7) ("'recognition' means the entry of an order granting recognition of a foreign main proceeding or foreign nonmain proceeding under

this chapter"); 1517(a)(1) ("Subject to section 1506,[15] after notice and a hearing, an order

recognizing a foreign proceeding shall be entered if such foreign proceeding for which

recognition is sought is a foreign main proceeding or foreign nonmain proceeding within

the meaning of section 1502").  Thus, in Bankruptcy Code sections 1502(7), 1504, and

1517(a)(1) Congress separated the concept of "recognition" from the concept of

"recognition as a foreign main (or nonmain) proceeding" under section 1517(b).[16]

       Although the court has the power to grant, under appropriate

circumstances, extensive relief whether the foreign proceeding is recognized as "main" or

"nonmain," recognition of the proceeding as a "foreign main proceeding" under section

1517(b)(1) does trigger some additional relief under section 1520(a) of the Bankruptcy

Code.  That is, upon recognition of the foreign proceeding as a "foreign main

proceeding," (a) the automatic stay under Bankruptcy Code section 362 (as well as the

creditors' right to adequate protection and relief from the automatic stay under sections

361 and 362(d) of the Bankruptcy Code) applies with respect to the debtor and its

property within the territorial jurisdiction of the United States, (b) sections 363, 549 and

552 of the Bankruptcy Code apply to restrict the ability to transfer such property absent

court approval, and (c) unless the court orders otherwise, the foreign representative may

---

[15] Section 1506 of the Bankruptcy Code provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  According to the legislative history, this provision in similar Model Law contexts "has been narrowly interpreted on a consistent basis in courts around the world.  The word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States."  H.R. Rep. 109-31, pt. 1, 109th Cong. 1st Sess. at 109 (2005).  See also In re RSM Richter v. Aguilar (In re Ephedra Prods. Liab. Litigation), 2006 U.S. Dist. LEXIS 57595 (S.D.N.Y. August 11, 2006).

[16] See also 11 U.S.C. § 1517(c), which provides that "[a] petition for recognition of a foreign proceeding" – note, not a petition for recognition as a foreign main proceeding – "shall be decided upon at the earliest possible time.  Entry of an order recognizing a foreign proceeding constitutes recognition under this chapter."

operate the debtor's business and exercise the rights and powers of a trustee under

Bankruptcy Code sections 363 and 552.  11 U.S.C. § 1520(a)(1)-(3).

In addition to this relief and perhaps a surprisingly small number of other

distinctions between foreign main and nonmain proceedings specifically set forth in

chapter 15,[17] recognition of a foreign main proceeding may also serve to indicate that the

reasonable interests of creditors and the maximization of value, as well as considerations

of international comity, generally support the bankruptcy court's deference to such

proceeding.  On the other hand, it is equally important to note that the Bankruptcy Code

does not expressly mandate such across-the-board deference, nor would recognition of a

foreign main proceeding necessarily be binding on choice of law determinations.  Thus,

while the decision to recognize a foreign proceeding as "main" may be viewed by some

as significant, it has limited specified consequences under chapter 15 (particularly since

the chapter gives the bankruptcy court the ability to grant substantially the same types of

relief in assistance of foreign nonmain proceedings as main proceedings and to condition

the foreign representative's ability to operate the business and dispose of the debtor's

assets under section 1520(a)(3)), and, moreover, recognition itself is subject to review

and modification under Bankruptcy Code section 1517(d).

The Refco Committee and the RCM Trustee do not invest much energy

disputing the JOLs satisfaction of chapter 15's requirements for recognition under section

---

[17] For example, after recognition of a foreign main proceeding, the effects of a case under another chapter of the Bankruptcy Code are restricted to the assets of the debtor located within the territorial jurisdiction of the United States and, to the extent necessary to implement cooperation and coordination with the foreign court, to other assets of the debtor that are within the bankruptcy court's extraterritorial jurisdiction, to the extent not within the jurisdiction of a previously recognized foreign proceeding.  11 U.S.C. § 1528.  That is, the concurrent case under the Bankruptcy Code should generally serve the interests of the foreign main proceeding – subject, of course, to the court's duty to condition or modify relief to protect creditors as discussed above.

1517(a)(1).[18]  In any event, the Cayman Islands proceedings, under which the SPhinX

Funds are being wound up subject to the supervision of the Cayman Court in collective

proceedings under the Companies Law, are "foreign proceedings" under Bankruptcy

Code section 101(23).  Compare Hoffman v. Bullmore (In re Nat'l Warranty Ins. Risk

Retention Group), 306 B.R. 614, 620-21 (BAP 8th Cir. 2004), aff'd 384 F.3d 959 (8th Cir

2004); In re Gee, 53 B.R. 891, 904 (Bankr. S.D.N.Y. 1985) (each recognizing, for

purposes of Bankruptcy Code section 304, court-supervised Cayman Islands winding up

proceedings) with In re Tam, 170 B.R. 838, 844-46 (Bankr. S.D.N.Y. 1994) (not

recognizing, for purposes of section 304, a voluntary Cayman Islands winding up

proceeding that was not subject to supervision by the Cayman Court).[19]  The JOLs have

also provided a certified copy of the Cayman Court's order appointing them to administer

the Debtors' winding up under the Companies Law and authorizing their commencement

of these chapter 15 cases, thereby satisfying Bankruptcy Code sections 101(24) and

1515(b); and they also have satisfied Bankruptcy Code section 1515(c) by stating that

they do not know of any other foreign proceedings with respect to the SPhinX Funds.

Consequently, the Cayman Islands proceedings are entitled to recognition.  11 U.S.C. §

1517(a)(1)-(3).

> The real dispute concerns whether the Cayman Islands proceedings should

be recognized as foreign main proceedings under Bankruptcy Code section 1517(b)(1),

---

[18]  As noted above the RCM Trustee contends that the SPhinX Funds are solvent and have no need to be
wound up; however, neither the RCM Trustee nor any other party-in-interest contends that liquidation is
inimical to the Debtors.  Thus it does not appear that the commencement of Cayman Islands winding up
proceedings for these admittedly liquidating entities, all of which are registered in the Cayman Islands and
several of which, as SPCs, are subject to additional Cayman Islands regulation, would be "manifestly
contrary to the public policy of the United States."  11 U.S.C. § 1506.

[19]  The JOLs also asserted, without opposition by any investor, that the Debtors are not stockbrokers, their
investors being shareholders in, rather than customers of, the SPhinX Funds.  The Debtors therefore are not
ineligible for chapter 15 relief under section 1501(c)(3) of the Code.

although, as noted above, the statutory and practical effects of this decision are not as important as the parties may believe.

On the issue of recognition of foreign proceedings as "main" or "nonmain," the Bankruptcy Code provides considerable but not complete direction. "A 'foreign main proceeding' means a foreign proceeding pending in the country where the debtor has its center of main interests" ("COMI"). 11 U.S.C. § 1502(4). And, "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the [COMI]." 11 U.S.C. § 1516(c). Therefore, because the SPhinX Funds' COMI is presumed to be the Cayman Islands, where each Debtor is registered, the Cayman Islands proceedings are presumed to be foreign main proceedings.

Pursuant to the introductory clause to Bankruptcy Code 1516(c), however, that presumption may be rebutted. The legislative history makes it clear, moreover, that "[t]he ultimate burden as to each element [of recognition] is on the foreign representative, although the court is entitled to shift the burden to the extent indicated in section 1516." H.R. Rep. 109-31, pt. 1, 109th Cong. 1st Sess. at 112-113 (2005). The legislative history also indicates that the statutory presumption of section 1516(c) may be of less weight in the event of a serious dispute: "[t]he presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy." Id.

The Bankruptcy Code does not state the type of evidence required to rebut the presumption that the COMI is the debtor's place of registration or incorporation. Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the

debtor (which, conceivably could be the headquarters of a holding company); the location

of the debtor's primary assets; the location of the majority of the debtor's creditors or of a

majority of the creditors who would be affected by the case; and/or the jurisdiction whose

law would apply to most disputes.

As discussed above, the flexibility inherent in chapter 15 strongly

suggests, however, that the Court should not apply such factors mechanically.  Instead,

they should be viewed in light of chapter 15's emphasis on protecting the reasonable

interests of parties in interest pursuant to fair procedures and the maximization of the

debtor's value.  Because their money is ultimately at stake, one generally should defer,

therefore, to the creditors' acquiescence in or support of a proposed COMI.  It is

reasonable to assume that the debtor and its creditors (and shareholders, if they have an

economic stake in the proceeding) can, absent an improper purpose, best determine how

to maximize the efficiency of a liquidation or reorganization and, ultimately, the value of

the debtor, assuming also, of course, that chapter 15 requires the court to protect the

legitimate interests of dissenters (even to the extent of enabling the modification of a

recognition order under Bankruptcy Code section 1517(d)), particularly where other

objective factors point to a different COMI.  Relatedly, if the parties in interest are in a

legitimate dispute over the debtor's COMI, it is probably safe to assume that promoting

cooperation among courts and the parties will play a greater role than artificially

choosing one proceeding as a "primary" proceeding.  At least this is what the Court takes

away from the stated objectives and structure of the statute.

There appear to be no published cases involving a dispute over COMI

under chapter 15.  But that is not the end of the inquiry; in keeping with its international

context, chapter 15 directs courts also to obtain guidance from the application of similar

statutes by foreign jurisdictions:  "[i]n interpreting this chapter, the court shall consider

its international origin, and the need to promote an application of this chapter that is

consistent with the application of similar statutes adopted by foreign jurisdictions."  11

U.S.C. § 1508.  See also 11 U.S.C. § 1501(a) (noting chapter 15's incorporation of the

Model Law).  Unfortunately, foreign case law under analogous statutes also is not

sufficiently established to provide much more guidance on what must be shown to rebut

the COMI presumption, with the exception of the only foreign decision that the parties

have cited, a recent ruling by the European Court of Justice, which stated that the scope

of the COMI concept

> is highlighted by the 13th recital of the [EC] Regulation,[20] which states that
> the 'centre of main interests' should correspond to the place where the
> debtor conducts the administration of his interests on a regular basis and is
> therefore ascertainable by third parties.'
>
> The definition shows that the center of main interests must be identified by
> reference to criteria that are both objective and ascertainable by third
> parties. . . .
>
> It follows that, in determining the center of the main interests of a debtor
> company, the simple presumption laid down by the [European]
> Community legislature in favour of the registered office of that company
> can be rebutted only if factors which are both objective and ascertainable
> by third parties enable it to be established that an actual situation exists
> which is different from that which locating it at that registered office is
> deemed to reflect.
>
> That could be so in particular in the case of a 'letterbox' company not
> carrying out any business in the territory of the Member State in which its
> registered office is situated.

Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.), Case 341/04, slip op. at 6,

2006 E.C.R. __ 2006 WL 1142304 (E.C.J. May 2, 2006) (emphasis added).

---

[20] Council Regulation 1346/2000 of 29 May 2000 on Insolvency Proceedings, 2000 O.J. (L. 160), 1, 2,
available at http://147.67.4.5/eur-lex/pri/en/oj/dat/2000/l_160/l_16020000630en00010018.pdf.

In the Eurofood case, however, the European Court of Justice, based on the question certified to it, assumed that the only evidence offered to rebut the place-of-reregistered-office presumption was that management for the holding company that owned the debtor made decisions on the debtor's behalf in the alternative proposed COMI.  The court assumed that the debtor was not a mere "letterbox" company that was not carrying out any real business in the location of its registered office; instead, it assumed that the debtor "regularly administered its interests, in a manner ascertainable by third parties and in respect of its own corporate identity, in the Member State where its registered office is situated."  Id., slip op. at 5-6.  The COMI registered office presumption therefore was not rebutted on the facts of the question certified.  Id., slip op. at 6.  Eurofood therefore left open whether the presumption may be rebutted in respect of a debtor that conducts some business in the location where it is registered (even if, as in the case of the SPhinX Funds, most, if not all, of that business pertains to maintaining its status as an entity registered in that location), although the ECJ strongly indicated that if third parties would objectively locate the administration of such a debtor's interests elsewhere, the presumption would be rebutted.[21]

---

[21] One other recent foreign decision also is relevant, although it applies common law principles of international comity rather than interprets the Model Law.  In Cambridge Gas Transport Corp. v. Official Committee of Unsecured Creditors (of Navigator Holdings PLC et al.), [2006] UKPC (Lords of the Judicial Committee of the Privy Counsel) 26 (U.K.) [2006], 3 All E.R. 829, the Privy Council considered whether a request to transfer shares in a Manx company in order to implement a plan of reorganization previously confirmed under chapter 11 of the Bankruptcy Code should be recognized.  It was argued on appeal that because the U.S. bankruptcy court did not have jurisdiction over the Manx shareholder, the Manx court should not have provided assistance to implement the chapter 11 plan.  Lord Hoffman's statement of the ruling recognized, however, (a) that the Manx court at least had the power to assist the implementation of the chapter 11 plan to the extent that domestic insolvency law permitted and (b) it should do so in light of the economic reality that any interest in an insolvent Manx company was effectively reorganized by a chapter 11 plan that bound the company in which the shares were issued.  Id. at 22, 26.  To rule otherwise would delay and frustrate those with the real economic stake.  Without discussing COMI at all, the decision made clear that a court can provide material assistance to a foreign court based on economic reality under principles of comity, as can this Court under chapter 15, whether or not the foreign jurisdiction is the COMI or the foreign proceedings are treated as main or nonmain.  See

In light of the foregoing principles, important objective factors point to the SPhinX Funds' COMI being located outside of the Cayman Islands.  As far as the administration of the Debtors' interests is concerned, the SPhinX Funds' hedge fund business was conducted by PlusFunds outside of the Cayman Islands, as were most of the SPhinX Funds' back-office operations, by DPM.  The only business done in the Cayman Islands apparently was limited to those steps necessary to maintain the SPhinX Funds in good standing as registered Cayman Islands companies and certain SPhinX Funds as SPCs.  There were no employees or managers in the Cayman Islands, and the Debtors' boards, which contained no Cayman Islands residents, never met in the Cayman Islands.

Pragmatic considerations affecting the Debtors' cases also point to a COMI outside of the Cayman Islands.  With the exception of corporate minute books and similar records, the JOLs have not identified any assets located in the Cayman Islands; thus the JOLs and the Cayman Court would have to seek assistance from other courts (primarily this Court because most of the assets are in the U.S.) to realize on the SPhinX Funds' assets that will go to pay creditors and investors.  See In re Rimsat, Ltd., 98 F.3d at 961-62 (efficacy of a bankruptcy largely depends on court's ability to control and marshal assets).  In addition, most, if not all, of the creditors and investors are located outside of the Cayman Islands; absent their consent or another undisclosed basis for jurisdiction over them, the Cayman Court would have to rely on orders of other courts to bind them.  In re Aerovias Nacionales De Colombia S.A., 303 B.R. at 13 ("Today, especially in a reorganization, the presence of creditors in a jurisdiction, the power of a

---

also In re Aerovias Nacionales de Colombia S.A. Avianca & Avianca, Inc., 345 B.R. 120 (S.D.N.Y. 2006) (court entered order providing for, and upheld resolution of, Colombian labor-related claims in Colombian dispute resolution procedures, notwithstanding debtor's pending chapter 11 case).

court to exert judicial power over them, and the willingness of other creditors to submit to

the jurisdiction of the court, is often a more important factor than the presence of assets. .

. .").  Perhaps for these reasons, the JOLs did not seek a determination from the Cayman

Court that the Cayman Islands was the SPhinX Funds' COMI.[22]  In any event, there has

been no such determination, nor have the JOLs yet sought the assistance of this Court to

enforce any order of the Cayman Court intended to have extraterritorial effect.

On the other hand, the JOLs note that no party in interest besides the

Refco Committee and the RCM Trustee has objected to the Petition, which clearly sought

recognition of the Cayman Islands proceedings as foreign main proceedings.  Further,

they point out that those proceedings are voluntary, and that no one else has been

appointed to wind up the Debtors' affairs.  The objectors criticized the circularity of this

logic -- i.e., the Cayman Islands must be the Debtors' COMI because that is where the

JOLs were appointed – but, given the disarray and immanent liquidation of the Debtors'

manager, PlusFunds, and the fact that the SPhinX Funds are not continuing in business,

someone needs to manage the Debtors' winding up.  And the Court notes that no one,

including the objectors, has questioned the JOLs' ability to wind up the Debtors or that

the Cayman Court would supervise the foreign proceedings fairly.  See In re Nat'l

Warranty Risk Ins. Retention Group v. Bullmore, 384 F.3d 959, 964 (8th Cir. 2004), in

which the Eighth Circuit upheld recognition of, and a broad injunction assisting, a

Cayman Islands winding up proceeding under Bankruptcy Code section 304,

---

[22] While acknowledging this fact, the JOLs' Cayman Islands counsel nevertheless asserted that the Cayman
Court's authorization of the JOLs "to commence foreign ancillary insolvency proceedings in furtherance of
the winding up of the [Debtors] (including commencing a Chapter 15 proceeding under the United States
Bankruptcy Code)" indicated the Cayman Court's view that the Cayman Islands proceedings should be
primary.  Tr. at 51.  This overlooks, however, that cases under chapter 15 are ancillary regardless whether
the foreign proceeding is main or nonmain.  11 U.S.C. § 1504.  Moreover, notwithstanding the respect that
this Court has for the Cayman Court, even if the Cayman Court had made such a determination it would not
be binding on this Court.

notwithstanding that the debtor's headquarters and all of its business were located in the

U.S.  As here, in In re Nat'l Warranty, there were no other pending insolvency

proceedings involving the debtor, the proffered alternative to the Cayman Islands

proceedings being a class action or other piecemeal enforcement litigation.  Id. at 963.

   In addition, the JOLs have argued that Cayman Islands law has specific

winding up requirements at least with respect to the SPCs, Tr. at 51, although the JOLs'

Cayman Islands counsel also acknowledged that she was not aware of any prohibition on

any Debtor being the subject of insolvency proceedings outside of the Cayman Islands.

Tr. at 57-8.  The JOLs also point out that the SPhinX Funds clearly held themselves out

in their Offering Memorandum as offshore, Cayman Islands entities.  As with the prior

argument regarding Cayman Islands' regulatory interests, however, this point has force

primarily in relation to the legitimate interests of the SPhinX Funds' investors, not

creditors whose claims may not have been incurred with a focus on the Debtors' offshore

status.

   But for one additional consideration, discussed below, upon the

assumption that the Cayman Islands proceedings will primarily involve the investors,

who, again, have not objected to the Petition, in balancing all of the foregoing factors the

Court might be inclined to find the Debtors' COMI in the Cayman Islands and recognize

the proceedings as foreign main proceedings (noting, however, the limited practical effect

of such recognition and the Court's ongoing duty to protect parties in interest).

Concededly, a simple "location of administration of the debtor's interests test," could

well result in a different outcome, particularly if there was a possibility of reorganization.

But because these are liquidation cases in which competent JOLs under the supervision

of the Cayman Court are the only parties ready to perform the winding up function, and, importantly, the vast majority of the parties in interest tacitly support that approach, normally the Court would recognize the Cayman Islands proceedings as main proceedings.

However, a primary basis for the Petition, and the investors' tacit consent to the Cayman Islands proceedings as foreign main proceedings, is improper:  that is, it has the purpose of frustrating the RCM Settlement by obtaining a stay of the appeals upon the invocation of Bankruptcy Code section 362(a) that would go into effect under section 1520(a)(1) upon such recognition.  See Tr. at  87, at which counsel for the JOLs reluctantly admitted this strategy, after considerable efforts by Mr. Stride and counsel to obfuscate it.  Id. at 41-4, 47, 84.  As noted above, staying the appeal would have the same effect as overturning the RCM settlement without addressing or prevailing on the merits. (It is this sidestepping of consideration of the merits, or, at a minimum, obtaining strategic leverage without addressing the merits, rather than the JOLs' taking a position contrary to the settlement, that is the problem.)  Indeed, given that the JOLs did not articulate a proper basis, or even actively pursue a request, for any other relief under chapter 15 – for example, an injunction or turnover of property – with the exception of a request for further discovery primarily relating to the appeals, Tr. at 88-89,[23] this litigation strategy appears to be the only reason for their request for recognition of the Cayman Islands proceedings as foreign main proceedings.

---

[23] It became clear at oral argument that the JOLs were seeking a blanket ruling that privileges, such as the attorney-client privilege, would not apply in connection with such discovery, although the Petition had not addressed this point.  Id.  The Court permitted general discovery of the Debtors' affairs, subject, however, to further determination, on notice, of any issues pertaining to the assertion of an applicable privilege.

In any event, the strategy taints the JOLs' request and the investors'

consent to it, giving the clear appearance of improper forum shopping.  In re Rimsat,

Ltd., 98 F.3d at 962 (noting similar "strategic conduct that is not to be encouraged" by

deferral to foreign proceeding).  Moreover, the JOLs were not prepared to agree to

conditions to protect the Refco Committee and the RCM Trustee against their litigation

strategy, Tr. at 106-107, and, based upon the plain language of Bankruptcy Code sections

1520(a)(1) and 1522,[24] the Court has doubts about its ability to condition its ruling on

immediate sua sponte relief from the automatic stay -- even though there also is

substantial doubt whether the automatic stay would apply to the appeals and it is even

less likely that the stay should continue to apply after a motion for relief under

Bankruptcy Code section 362(d)(1).

This leaves whether, in light of the foregoing, the Court should, after

having granted recognition under Bankruptcy Code sections 1515 and 1517(a), simply

deny or defer the JOLs' request to recognize the Cayman Islands proceedings as foreign

main proceedings, or, on the other hand, recognized them now as foreign nonmain

proceedings, subject, of course to later modification under section 1517(d)?

Under either approach, the Court would be able to grant the JOLs the same

significant relief upon a proper showing, given the Court's view that Congress separated

the concept of "recognition" under Bankruptcy Code section 1517(a) from the concept of

"recognition as a foreign nonmain proceeding" under section 1517(b)(2).  (Indeed, as

noted above, except for the applicability of the automatic stay, the potential relief

---

[24] Although section 1522 gives the Court ample flexibility to protect the legitimate interests of creditors, such as RCM, in most situations, it does not appear to do so with regard to the invocation of the automatic stay under section 1520(a)(1) of the Bankruptcy Code upon recognition of a foreign main proceeding, except under section 362(d).

available to the JOLs under chapter 15 in almost all respects does not depend on whether

the Cayman Islands proceedings are recognized as "main" or "nonmain.")  In light of the

foregoing, in some circumstances it may be appropriate to defer consideration of the

issue, to permit the facts to develop further.  However, here, where so many objective

factors point to the Cayman Islands not being the Debtors' COMI, and no negative

consequences would appear to result from recognizing the Cayman Islands proceedings

as nonmain proceedings, that is the better choice.[25]

       This raises a second question:  can there be a foreign nonmain proceeding

when there is no other pending proceeding?  (There is now, of course, no other plenary

proceeding for these Debtors, and there never may be one.)  However, nothing in chapter

15 provides that there cannot be a "nonmain" proceeding unless there is a "main"

proceeding.  Moreover, given all of the SPhinX Funds' contacts elsewhere, a plenary

proceeding could easily be filed outside of the Cayman Islands, by or against the Debtors.

Such a proceeding – although now just a hypothetical or "shadow" proceeding -- would

quite conceivably qualify as a main proceeding given the Debtors' lack of contacts with

the Cayman Islands.  Indeed, it is only in the absence of such an alternative proceeding

that it would make sense, with the exception of the JOLs' litigation strategy discussed

above, to treat the Cayman Islands proceedings as main proceedings.  Thus it would run

contrary to logic as well as the statute's plain language and purpose to force the court to

recognize a foreign proceeding as a "main" proceeding simply because it was the only

proceeding currently pending.

---

[25] One may also read Bankruptcy Code sections 1502(7) and 1517(a)(1) as directing the court to determine
whether the foreign proceeding is "main" or "nonmain," although, consistent with the other provisions of
chapter 15, the statute does not appear to set a deadline for this determination.

Given all of the reasons for not finding the SPhinX Funds' COMI in the

Cayman Islands -- and the lack of legitimate prejudice to the JOLs, given their access to

broad relief upon recognition of the Cayman Islands proceedings as foreign nonmain

proceedings -- the JOLs' Petition for recognition of the Cayman Islands proceedings as

foreign main proceedings is denied.  The proceedings are recognized as foreign nonmain

proceedings, subject to later modification under section 1517(d) of the Bankruptcy Code.

An order to that effect will be entered.

Dated:  New York, New York
        September  6, 2006


                                        /s/Robert D. Drain
                                        **UNITED STATES BANKRUPTCY JUDGE**